IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 24-4392

———————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

GERALD KEMONDRE TAYLOR,

*Appellant*.

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Richmond
*The Honorable Roderick Charles Young, District Judge*

———————————

BRIEF OF THE UNITED STATES

———————————

Erik S. Siebert                          James Reed Sawyers
United States Attorney           Assistant United States Attorney
                                               2100 Jamieson Avenue
Olivia L. Norman                     Alexandria, Virginia 22314
Assistant United States Attorney    (703) 299-3700

*Attorneys for the United States of America*

## Table of Contents

**Page**

Table of Authorities ................................................................................................ iii

Introduction ........................................................................................................1

Issue Presented ...................................................................................................2

Statement of the Case.........................................................................................2

    A.    Officers find a machinegun conversion device tucked into
          Taylor's waistband. ................................................................................2

    B.    Taylor enters a conditional guilty plea to possessing a
          machinegun conversion device. .............................................................2

Summary of Argument.......................................................................................3

Argument.............................................................................................................5

    The district court properly denied Taylor's motion to dismiss because
    18 U.S.C. § 922(o) is constitutional as applied and on its face......................6

    A.    Section 922(o) is constitutional in all of its applications because
          the Second Amendment does not protect machineguns......................8

          1.    Machineguns are not "arms" in common use for a lawful
                purpose encompassed by the Second Amendment. .......................8

          2.    Section 922(o) is consistent with the historical traditions of
                prohibiting "dangerous and unusual" weapons and those that
                are "excessively dangerous." ......................................................21

    B.    At a minimum, Section 922(o) is constitutional as applied to
          Taylor's possession of a machinegun conversion device. .................26

          1.    Conversion devices are unprotected firearm accessories, not
                protected "arms." .........................................................................27

2. Conversion devices are rarer, more dangerous, and less useful for lawful purposes than traditional machineguns. ............29

3. Taylor's remaining arguments miss the mark. ..............................32

C. Taylor's facial challenge is underdeveloped and meritless. ...............37

Conclusion ..............................................................................................38

Statement Regarding Oral Argument .......................................................39

Certificate of Compliance ......................................................................39

# Table of Authorities

## Cases

*Arms v. City of Chicago*, 2024 WL 3495010 (N.D. Ill. July 22, 2024)..................27

*Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) .....................................20

*Bailey v. United States*, 516 U.S. 137 (1995) ........................................................16

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ............................... 15, 22

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc) ........................... passim

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) (per curiam)..................... 9, 20, 22

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... passim

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)................. 11, 17

*Garland v. Cargill*, 602 U.S. 406 (2024)................................................................21

*Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009) .......................................10

*Hanson v. District of Columbia*, 120 F.4th 223 (D.C. Cir. 2024) (per
    curiam) .............................................................................................................22

*Haynes v. United States*, 390 U.S. 85 (1968) .................................................. 13, 30

*Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010)............................................6

*Hollis v. Lynch*, 827 F.3d 436 (5th Cir. 2016)................................................ passim

*Johnson v. United States*, 576 U.S. 591 (2015) .....................................................30

*Lennear v. Wilson*, 937 F.3d 257 (4th Cir. 2019) ...................................... 11, 12, 33

*Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en
    banc)............................................................................................... 9, 23, 34

*Miller v. Garland*, 674 F. Supp. 3d 296 (E.D. Va. 2023)......................................27

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .................. passim

*Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63 (D. Conn.
    2023) ................................................................................................................17

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) .................................29

*Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721 (2003) ........................................29

*Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024) ................................................................................22

*Sloas v. CSX Transp., Inc.*, 616 F.3d 380 (4th Cir. 2010) ......................................25

*Staples v. United States*, 511 U.S. 600 (1994) ........................................................13

*United States v. Alsenat*, 734 F. Supp. 3d 1295 (S.D. Fla. 2024).............. 19, 27, 29

*United States v. Barronette*, 46 F.4th 177 (4th Cir. 2022)........................................6

*United States v. Berger*, 715 F. Supp. 3d 676 (E.D. Pa. 2024) .............................29

*United States v. Boyd*, 5 F.4th 550 (4th Cir. 2021)................................................26

*United States v. Brehm*, 691 F.3d 547 (4th Cir. 2012) ...........................................25

*United States v. Brown*, 2025 WL 429985 (S.D. Miss. Jan. 29, 2025) .................35

*United States v. Canada*, 123 F.4th 159 (4th Cir. 2024) ........................................38

*United States v. Chan*, 2024 WL 4028019 (D. Haw. Sept. 3, 2024)......................33

*United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018)................................... 27, 37

*United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024) ........................................ 9, 35

*United States v. Fincher*, 538 F.3d 868 (8th Cir. 2008) .........................................11

*United States v. Fisher*, 2024 WL 589115 (W.D.N.C. Feb. 13, 2024) .......... passim

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ......................... 10, 13, 14, 30

*United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024) ...................................... 11, 35

*United States v. Johnson*, 2024 WL 4612888 (E.D. Mich. Oct. 29, 2024) ............................................................................. 15, 27, 28

*United States v. Lane*, 689 F. Supp. 3d 232 (E.D. Va. 2023) ...................................3

*United States v. Miller*, 307 U.S. 174 (1939) ...........................................................8

*United States v. Morgan*, 2024 WL 3936767 (D. Kan. Aug. 26, 2024)........... 33, 34

*United States v. O'Brien*, 560 U.S. 218 (2010) ............................................... 14, 30

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No.: LW001804*, 822 F.3d 136 (3d Cir. 2016) ................................................................... 10, 13

*United States v. Ovalle*, 2024 WL 4678881 (5th Cir. Nov. 5, 2024) (per curiam) ........................................................................................ 11, 35

*United States v. Peterson*, --- F.4th ----, 2025 WL 414654 (5th Cir. 2025) ............................................................................. 27, 28, 33

*United States v. Price*, 111 F.4th 392 (4th Cir. 2024) (en banc) .................... passim

*United States v. Pruess*, 703 F.3d 242 (4th Cir. 2012) ............................................7

*United States v. Rahimi*, 602 U.S. 680 (2024) ................................................. passim

*United States v. Saleem*, 2024 WL 5084523 (4th Cir. Dec. 12, 2024) (per curiam) .......................................................................... passim

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................6

*United States v. Taylor-Sanders*, 88 F.4th 516 (4th Cir. 2023) ..............................37

*United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992) .......................13

*United States v. Zaleski*, 489 F. App'x 474 (2d Cir. 2012) (summary order)....................................................................................................10

*Walker v. Donahoe*, 3 F.4th 676 (4th Cir. 2021) .....................................................9

*Yee v. City of Escondido*, 503 U.S. 519 (1992) .....................................................26

## Statutes

18 Pa. Cons. Stat. § 908 ........................................................................................19

18 U.S.C. § 922.............................................................................................. 1, 2, 15

26 U.S.C. § 5845 .......................................................................................... 2, 28, 29

720 Ill. Comp. Stat. 5/24-1 ............................................................................. 19, 32

Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90.........................................................24

Alaska Stat. § 11.61.200 .........................................................................................19

Ariz. Rev. Stat. Ann. § 13-3101...............................................................................19

Ariz. Rev. Stat. Ann. § 13-3102...............................................................................19

Ark. Code Ann. § 5-73-204 .....................................................................................19

Cal. Penal Code § 16880..........................................................................................31

Cal. Penal Code § 32625 .................................................................................. 19, 31

Colo. Rev. Stat. § 18-12-101 ...................................................................................31

Colo. Rev. Stat. § 18-12-102 ........................................................................... 19, 31

Conn. Gen. Stat. § 53-202 ................................................................19

Conn. Gen. Stat. § 53-206g ........................................................ 29, 31

D.C. Code § 7-2501.01 ................................................................31

D.C. Code § 7-2502.02 ............................................................ 19, 31

D.C. Code § 22-4514 ............................................................... 19, 31

Del. Code Ann. tit. 11, § 1444 .................................................. 19, 32

Fla. Stat. § 790.221 ...................................................................19

Fla. Stat. § 790.222 ...................................................................32

Ga. Code Ann. § 16-11-122 ........................................................19

Haw. Rev. Stat. § 134-1 ..............................................................32

Haw. Rev. Stat. § 134-8 .......................................................... 19, 32

Haw. Rev. Stat. § 134-8.5 ...........................................................32

Ind. Code § 35-31.5-2-190 ..........................................................32

Ind. Code § 35-47-5-8 ............................................................ 19, 32

Iowa Code § 724.1 .................................................................. 19, 32

Iowa Code § 724.3 .................................................................. 19, 32

Kan. Stat. Ann. § 21-6301 ...........................................................19

La. Stat. Ann. § 40:1751 .............................................................32

La. Stat. Ann. § 40:1752 .......................................................... 19, 32

Mass. Gen. Laws ch. 140, § 121 ..................................................32

Mass. Gen. Laws ch. 140, § 131 ..................................................19

Mass. Gen. Laws ch. 269, § 10(c) ............................................ 19, 32

Md. Code Ann., Crim. Law § 4-301 .............................................32

Md. Code Ann., Crim. Law § 4-305.1 ..........................................32

Md. Code Ann., Crim. Law § 4-403 .............................................19

Md. Code Ann., Crim. Law § 4-405 .............................................19

Me. Stat. tit. 17-A, § 1051 ...........................................................19

Mich. Comp. Laws § 750.224 ......................................................19

Mich. Comp. Laws § 750.224e .....................................................32

Minn. Stat. § 609.67 ........................................................................ 19, 32

Miss. Code Ann. § 97-37-39 ...................................................... 20, 29, 32

Mo. Rev. Stat. § 571.020 ......................................................................19

Mont. Code Ann. § 45-8-304 ...............................................................19

N.C. Gen. Stat. § 14-409 .............................................................. 19, 32

N.D. Cent. Code § 62.1-05-01 ..............................................................19

N.J. Stat. Ann. § 2C:39-3 .....................................................................32

N.J. Stat. Ann. § 2C:39-5 .....................................................................19

N.Y. Penal Law § 265.00 ......................................................................32

N.Y. Penal Law § 265.01-c ...................................................................32

N.Y. Penal Law § 265.02 ......................................................................19

Neb. Rev. Stat. § 28-1203 .....................................................................19

Nev. Rev. Stat. § 202.274 .....................................................................32

Nev. Rev. Stat. § 202.350 .....................................................................19

Ohio Rev. Code Ann. § 2923.11 ..................................................... 19, 32

Ohio Rev. Code Ann. § 2923.17 ..................................................... 19, 32

Or. Rev. Stat. § 166.272 ........................................................................19

R.I. Gen. Laws § 11-47-8 .............................................................. 19, 32

S.C. Code Ann. § 16-23-210 .................................................................32

S.C. Code Ann. § 16-23-230 .......................................................... 19, 32

S.D. Codified Laws § 22-1-2 .................................................................19

S.D. Codified Laws § 22-14-6 ...............................................................19

Tenn. Code Ann. § 39-17-1302 .............................................................19

Tex. Penal Code Ann. § 46.01 ..............................................................32

Tex. Penal Code Ann. § 46.05 ....................................................... 19, 32

Va. Code Ann. § 18.2-290 .....................................................................19

Va. Code Ann. § 18.2-291 .....................................................................19

Va. Code Ann. § 18.2-295 .....................................................................19

Va. Code Ann. § 18.2-308.5:1 ....................................................... 29, 32

Vt. Stat. Ann. tit. 13, § 4022 ........................................................ 20, 32

W. Va. Code § 61-7-9 .................................................................. 19, 32

Wash. Rev. Code § 9.41.190........................................................ 19, 32

Wis. Stat. § 941.25 ...........................................................................32

Wis. Stat. § 941.26 ...................................................................... 19, 32

## Other Authorities

ATF, *Firearms Commerce in the United States: Annual Statistical Update 2021* (2021) .........................................................................15

ATF, *National Firearms Commerce and Trafficking Assessment: Firearms Trafficking Investigations - Volume Three, Part X: National Illegal Firearm Recoveries* (2024) ......................................... 18, 30

Dept' of Just., *Justice Department Releases New Training to Focus on Detecting Machine Gun Conversion Devices* (Sept. 6, 2024)............... 18, 31

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150 (1995)........................................................16

J. Patrick Coolican, *18 Rounds in 5 Seconds: How Glock Became 'America's gun'*, Las Vegas Sun (Jan. 17, 2012) .........................................36

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022) ...................................16

## Constitutional Provisions

U.S. Const. amend. II ...............................................................................7

**Introduction**

Officers found a pistol equipped with a machinegun conversion device tucked in Gerald Taylor's waistband after he displayed it on social media. Taylor entered a conditional guilty plea to possessing a machinegun conversion device in violation of 18 U.S.C. § 922(o). On appeal, Taylor argues that Section 922(o) violates his Second Amendment right to keep and bear arms. It does not.

Section 922(o) is constitutional in all its applications because the Second Amendment does not protect machineguns. The Second Amendment right extends only to weapons commonly used by the public for lawful purposes. Machineguns are neither commonly owned by the public nor used for lawful purposes—as precedent, common sense, statistics, and state machinegun prohibitions confirm. Even were machineguns within the Second Amendment's ambit, they fit comfortably within dual historical traditions empowering the government to prohibit "dangerous and unusual" and "excessively dangerous" weapons.

At the very least, Section 922(o) is constitutional as applied to the machinegun conversion device Taylor possessed. Conversion devices are not "arms" at all, but rather unprotected firearm accessories. And conversion devices are even less common and useful for lawful purposes, and even more unusual and excessively dangerous than traditional machineguns. This Court should reject Taylor's Second Amendment challenge and affirm.

**Issue Presented**

Whether 18 U.S.C. § 922(o)'s prohibition on possessing a machinegun is

constitutional as applied and on its face.

**Statement of the Case**

**A.      Officers find a machinegun conversion device tucked into
          Taylor's waistband.**

Gerald Taylor displayed a firearm affixed with a machinegun conversion

device in an Instagram Live video.  JA83–84.  Richmond Police officers, who

recognized Taylor from a prior machinegun charge, located him in an open-air

stairwell in an apartment complex and found a gun (and attached conversion

device) tucked into his waistband.  JA83–84.  "[I]t appeared to be the same

firearm, affixed with a switch, that Taylor had displayed in the Instagram Live

video minutes before."  JA84.  Taylor admitted to the officers that he knew the

conversion device enabled his gun to fire automatically.  JA84.

**B.      Taylor enters a conditional guilty plea to possessing a
          machinegun conversion device.**

A grand jury in the Eastern District of Virginia indicted Taylor for

possessing a machinegun in violation of 18 U.S.C. § 922(o).  JA7.  Section 922(o)

makes it a crime to "transfer or possess a machinegun," subject to two limited

exceptions not applicable here.  18 U.S.C. § 922(o).  Federal law includes

conversion devices in the definition of "machinegun."  26 U.S.C. § 5845(b)

(defining "'machinegun'" to include "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machinegun"). Taylor's indictment thus specifically charged him with possessing a machinegun "'conversion switch.'" JA7.

Taylor moved to dismiss the indictment, arguing that it violated his Second Amendment right to keep and bear arms. JA9–17. The district court denied the motion, fully adopting its prior decision in *United States v. Lane*, 689 F. Supp. 3d 232 (E.D. Va. 2023). JA34–37. In *Lane*, the district court found that Section 922(o) was constitutional because machineguns are "'dangerous and unusual' weapons and thus are not weapons 'in common use'" protected by the Second Amendment. 689 F. Supp. 3d at 252.

Taylor entered a conditional guilty plea, preserving his Second Amendment challenge. JA73–74. The district court sentenced Taylor to 24 months' imprisonment, to be followed by three years of supervised release. JA88–89. This appeal followed.

## Summary of Argument

The district court correctly rejected Taylor's challenge to the federal machinegun ban. As binding precedent confirms, machineguns are not weapons commonly used for lawful purposes protected by the Second Amendment. In *District of Columbia v. Heller*, the Supreme Court expressly rejected the "startling"

3

proposition that "restrictions on machineguns . . . might be unconstitutional" and confirmed that "M–16" machineguns are not "'in common use'" and thus "may be banned." 554 U.S. 570, 624–25, 627 (2008). This Court, in turn, reiterated and relied on that admonition to uphold prohibitions on assault weapons and firearms with obliterated serial numbers. The other circuits, unsurprisingly, have also followed the Supreme Court's lead in recognizing that machineguns are not in common use for lawful purposes. Precedent alone thus forecloses Taylor's challenge.

While no further analysis is necessary, the other considerations to which courts have looked in determining whether a weapon is in common use for lawful purposes—common sense and lethality, statistics, and the number of jurisdictions that allow the weapon—likewise show that the machinegun ban is constitutional.

The machinegun ban is also consistent with the Nation's historical traditions of prohibiting weapons that are dangerous and unusual or excessively dangerous. Machineguns fit comfortably within both traditions for the same reasons they are not in common use for lawful purposes: Precedent has long recognized as much; their extraordinary lethality and diminished accuracy make them unsuitable for lawful purposes; they represent a miniscule fraction of the hundreds of millions of privately owned firearms and are not used for self-defense; and they are illegal under federal law and prohibited by virtually every state. The federal machinegun

ban is thus independently supported by historical tradition.

At a minimum, Section 922(o) is constitutional as applied to Taylor's possession of a machinegun conversion device. Conversion devices are neither bearable "arms," *i.e.*, armor or weapons, nor are they necessary for an arm to be useful and functional. Rather, like the silencers this Court (and every circuit to confront the issue) has held are outside the Second Amendment's ambit, conversion devices are unprotected firearm accessories. And, in any event, conversion devices are even more uncommon, more dangerous, and less useful for lawful purposes than traditional machineguns. Conversion devices thus are not in common use by the public for lawful purposes and are unusual and exceptionally dangerous devices beyond the Second Amendment's protection.

Finally, Taylor's three-sentence facial challenge is underdeveloped and would fail on the merits regardless because Section 922(o) is constitutional, at the very least, as to conversion devices.

Accordingly, this Court should affirm.

## Argument

The district court did not err in rejecting Taylor's challenge to 18 U.S.C. § 922(o). The federal machinegun ban is constitutional as applied to all machineguns, which are unprotected by the Second Amendment. As the Supreme Court and this Court have affirmed, machineguns are not arms in common use by

5

the public and therefore are not encompassed by the Second Amendment's text. The ban is also independently permissible because it is consistent with the Nation's historical traditions of prohibiting "dangerous and unusual" weapons and those that are "exceptionally dangerous."

At a minimum, Section 922(o) is constitutional as to the conversion device Taylor possessed. Like silencers, conversion devices are unprotected firearm accessories, rather than protected "arms." And they are even more dangerous, less common, and less used for lawful purposes than traditional machineguns.

**The district court properly denied Taylor's motion to dismiss because 18 U.S.C. § 922(o) is constitutional as applied and on its face.**

The sole issue on appeal is whether the district court properly denied Taylor's motion to dismiss the indictment. Taylor maintains that Section 922(o) is unconstitutional both as applied to his conduct and on its face. An as-applied challenge requires the Court to consider whether a statute is constitutional "as applied to the particular facts at issue." *United States v. Barronette*, 46 F.4th 177, 190 (4th Cir. 2022) (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010)). A facial challenge, by contrast, "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "[T]o prevail" on a facial challenge, "the Government need only

demonstrate that" the statute "is constitutional in some of its applications." *Id.*
This Court reviews Taylor's constitutional claim de novo. *United States v. Pruess*,
703 F.3d 242, 245 (4th Cir. 2012).

The Second Amendment protects "the right of the people to keep and bear
Arms." U.S. Const. amend. II. "'Like most rights' . . . 'the right secured by the
Second Amendment is not unlimited.'" *Rahimi*, 602 U.S. at 690. Among other
things, the right does not protect "certain types of weapons." *Heller*, 554 U.S. at
623. "From Blackstone through the 19th-century cases, commentators and courts
routinely explained that the right was not a right to keep and carry any weapon
whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. In
assessing a Second Amendment challenge, courts therefore look first to "the
Second Amendment's text, as informed by history." *N.Y. State Rifle & Pistol
Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022). If the challenger fails to establish that
"the historical scope of the right to keep and bear arms" "encompasses the . . .
conduct at issue," "the government may regulate it." *Bianchi v. Brown*, 111 F.4th
438, 445–46, 448 (4th Cir. 2024) (en banc) (citing *Bruen*, 597 U.S. at 24; *United
States v. Price*, 111 F.4th 392, 400–02 (4th Cir. 2024) (en banc)). Second, even if
the conduct at issue is within the Second Amendment's ambit, "regulation is
constitutionally permissible" if "'it is consistent with the Nation's historical
tradition of firearm regulation.'" *Id.* at 446 (quoting *Bruen*, 597 U.S. at 24).

7

Both text and historical tradition dictate Section 922(o)'s constitutionality. Machineguns are not "arms" protected by the Second Amendment because they are not commonly used by the public for lawful purposes. Machineguns also fit comfortably within the historical traditions empowering the government to prohibit weapons that are "dangerous and unusual" or "exceptionally dangerous."

## A. Section 922(o) is constitutional in all of its applications because the Second Amendment does not protect machineguns.

### 1. Machineguns are not "arms" in common use for a lawful purpose encompassed by the Second Amendment.

The Second Amendment applies to weapons that are "'in common use'" for lawful purposes, but "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624–25; *e.g.*, *United States v. Miller*, 307 U.S. 174, 179 (1939) ("in common use at the time"); *Bruen*, 597 U.S. at 47 ("'in common use at the time,' as opposed to those that 'are highly unusual in society at large'"); *Price*, 111 F.4th at 403 ("common use for a lawful purpose").

The "Supreme Court has not elucidated a precise test for determining whether a regulated arm is in common use for a lawful purpose." *Price*, 111 F.4th at 403. However, in making that determination, this Court in *Price* looked to "precedent," "common sense" informed by a weapon's "lethality," and "statistics." *Id.* at 403–07. Courts have also looked to the number of "jurisdictions" that "allow

8

or bar a particular weapon." *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016), *abrogated in part on other grounds by United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024); *see also Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in judgment) (contending that stun guns are in common use based on their legality in 45 states). Here, while precedent alone resolves the case, each consideration comes to the same place: Machineguns are not commonly used by the public for lawful purposes.

*Precedent.* In *Heller*, the Supreme Court found it "startling" to read the Second Amendment such that "restrictions on machineguns . . . might be unconstitutional." 554 U.S. at 624. Thus, the Court explicitly confirmed that "M–16" machineguns are not "'in common use'" and "may be banned." *Id.* at 627. Recognizing the "'substantial, if not controlling deference'" afforded even "'dicta from the Supreme Court,'" *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (en banc), this Court has repeatedly affirmed that "machineguns are not in common use for a lawful purpose," *Price*, 111 F.4th at 403; *e.g.*, *Bianchi*, 111 F.4th at 460 ("certain bearable arms . . . such as the M16 . . . are not protected by the Second Amendment"); *United States v. Saleem*, 2024 WL 5084523, at *1 (4th Cir. Dec. 12, 2024) (per curiam) ("'[W]e know from Supreme Court precedent that short-barreled shotguns and machineguns are not in common use for a lawful purpose.'"); *Walker v. Donahoe*, 3 F.4th 676, 684 (4th Cir. 2021) ("'M-16 rifles,'

i.e., 'weapons that are most useful in military service,' [are] outside the ambit of the Second Amendment."); *see also Bianchi*, 111 F.4th at 523 (Richardson, J., dissenting) ("*Heller* could say that laws banning weapons like short-barreled shotguns and machine guns are constitutional" because they are "'not typically possessed by law-abiding citizens for lawful purposes.'").

Every other circuit to consider the question has likewise followed the Supreme Court's lead in concluding that "[m]achineguns" are "not in common use" (and are "dangerous and unusual," *see infra* part A.2). *Hollis*, 827 F.3d at 451; *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No.: LW001804*, 822 F.3d 136, 142–43 (3d Cir. 2016) ("*Palmetto*") ("machine guns . . . are not in common use for lawful purposes"); *United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) ("[M]achine guns are highly 'dangerous and unusual weapons' that are not 'typically possessed by law-abiding citizens for lawful purposes.'"); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (summary order) ("[M]achine guns" are "'not typically possessed by law-abiding citizens for lawful purposes.'"); *Hamblen v. United States*, 591 F.3d 471, 474 (6th Cir. 2009) (Defendant's "challenge to his conviction for unlawful possession of unregistered machine guns has been directly foreclosed by the Supreme Court, which specifically instructed in *Heller* that 'the Second Amendment does not protect those weapons not typically possessed by

law-abiding citizens for lawful purposes.'"); *United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008) ("Machine guns are not in common use by law-abiding citizens for lawful purposes."); *see also, e.g.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) ("*Heller* deemed a ban on private possession of machine guns to be obviously valid.").

*Bruen* reaffirmed the "'common use'" and "'dangerous and unusual'" limitations on the Second Amendment right, 597 U.S. at 21, 32, 47, and "rejected only" the "'means-end scrutiny'" "step of" the "former" Second Amendment "test," *United States v. Hunt*, 123 F.4th 697, 704 (4th Cir. 2024). *Bruen* therefore "provide[s] no basis . . . to depart from" this uniform precedent. *Id.*; *e.g.*, *United States v. Ovalle*, 2024 WL 4678881, at *1 (5th Cir. Nov. 5, 2024) (per curiam) (recognizing that defendant's challenge to Section "922(o)" remains "foreclosed by *Hollis v. Lynch*").

Taylor dismisses *Price*, *Bianchi*, and *Heller* as irrelevant dicta. Def. Br. 12–13. Not so. A proposition is "not dicta" if it is "'integral to the analytical foundations of'" a "'holding.'" *E.g.*, *Lennear v. Wilson*, 937 F.3d 257, 273 (4th Cir. 2019). *Bianchi* and *Price* each relied on *Heller*'s confirmation that machineguns "may be banned," 554 U.S. at 627, to conclude that prohibitions on "assault weapons," *Bianchi*, 111 F.4th at 441, and "firearms with obliterated serial numbers" are constitutional, *Price*, 111 F.4th at 408. In *Bianchi*, this Court

compared the "AR-15" assault rifle to the "M16" machinegun, ultimately

concluding that "just like the M16, the AR-15 is 'most useful in military service'

and 'may be banned' consistent with the Second Amendment." 111 F.4th at 454–

59. Likewise, in *Price*, this Court looked to "Supreme Court precedent that short-

barreled shotguns and machineguns are not in common use for a lawful purpose,"

to distill its test "for determining whether a regulated arm is in common use for a

lawful purpose." 111 F.4th at 403. In other words, the recognition in *Bianchi* and

*Price* that machineguns are not protected by the Second Amendment was "'integral

to the analytical foundations of'" this Court's holdings and thus "not dicta."

*Lennear*, 937 F.3d at 273.

Taylor also suggests that *Bianchi*, which upheld Maryland's assault weapons

ban against a facial challenge, is inapplicable to his "as-applied challenge" because

Section 922(o) "would seemingly encompass 'a small hand-held taser or stun gun

. . . or a fully automatic BB gun.'" Def. Br. 13. Taylor, of course, pleaded guilty

to possessing a machinegun conversion device, not a BB gun. JA83. So even

were his strained statutory interpretation of Section 922(o) correct, it would do

nothing to aid his as-applied challenge, nor would it undermine *Bianchi*'s

affirmation that "'M-16'" machineguns "can be 'banned.'" 111 F.4th at 451.

Binding precedent thus forecloses Taylor's challenge. The remaining

considerations—common sense and lethality, statistics, and the legislative

landscape—only reaffirm that conclusion.

*Common sense and lethality*.  Common sense, as Taylor concedes, dictates that a "weapon" that "'inflict[s] damage on a scale or in a manner disproportionate to the end of personal protection,' is unlikely to be used for a lawful purpose and most likely falls outside the scope of the Second Amendment."  Def. Br. 9 (quoting *Bianchi*, 111 F.4th at 451).  That is true of "machinegun[s]," whose "lethality" makes them "best suited for war" and crime, "not self-defense."  *Price*, 111 F.4th at 406.

Machineguns "can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds."  *Henry*, 688 F.3d at 640.  As a result of their "'murderously effective firepower,'" *id.*, "machineguns" are "'primarily weapons of war,'" *Hollis*, 827 F.3d at 448.  Outside their appropriate military employment, machineguns are "'used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime.'"  *Palmetto*, 822 F.3d at 142.  The Supreme Court has consequently described them as "quasi-suspect" weapons, *Staples v. United States*, 511 U.S. 600, 612 (1994), "likely to be used for criminal purposes," *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion), and "used principally by persons engaged in unlawful activities," *Haynes v. United States*, 390 U.S. 85, 87 (1968).

Even outside of the hands of criminals, machineguns are "materially more dangerous" to innocent bystanders than other firearms because "the spray of projectiles from a machinegun is largely uncontrolled." *United States v. Fisher*, 2024 WL 589115, at *2 (W.D.N.C. Feb. 13, 2024). The heightened risk of collateral damage, moreover, is not offset by greater utility for self-defense: "'Civilian self-defense rarely—if ever—calls for the rapid and uninterrupted discharge of many shots'" and, indeed, "'most homeowners only use two to three rounds of ammunition in self-defense.'" *Bianchi*, 111 F.4th at 459. Machineguns thus "'have no appropriate sporting use or use for personal protection.'" *Hollis*, 827 F.3d at 448. Indeed, so "immense" is the "danger posed by machineguns" that the Supreme Court has characterized "choosing the weapon" as an act of "moral depravity." *United States v. O'Brien*, 560 U.S. 218, 230 (2010). All considered, "[s]hort of bombs, missiles, and biochemical agents," there are "few weapons that are more dangerous than machine guns." *Henry*, 688 F.3d at 640. "[C]ommon sense" thus dictates that there is no reason "for a law-abiding citizen to prefer a" machinegun "for a lawful purpose like self-defense." *Price*, 111 F.4th at 405–06.

*Statistics.* What common sense suggests, statistics confirm—machineguns are not commonly owned by the public for self-defense. Of the more than "400 million" firearms in the United States, *Bruen*, 597 U.S. at 73 (Alito, J., concurring), a mere 741,000 are lawfully registered machineguns, ATF, *Firearms Commerce in*

*the United States: Annual Statistical Update 2021* 15–16 (2021),

https://perma.cc/5FBE-2C9C.  Of those, most are "possessed by law enforcement

and other governmental entities, as well as firearms dealers who provide weapons

to such entities." *Fisher*, 2024 WL 589115, at \*2; *see* 18 U.S.C. § 922(o)(2)(A)

(exempting machineguns possessed under the authority of federal, state, and local

governments).  Private citizens, by contrast, are limited to machineguns

manufactured prior to 1986.  *See* 18 U.S.C. § 922(o)(2)(B); *Bevis v. City of

Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023) (explaining that "civilian

ownership has been capped at pre-1986 levels").  As of 2016, there were at most

"175,977 pre–1986 civilian-owned machineguns in existence," a number that can

only decrease over time.  *Hollis*, 827 F.3d at 449; JA18 (2016 ATF letter).

Moreover, due to the high cost brought about by their rarity, "many" civilian-

owned machineguns "are collector items" held by a limited number of collectors.

*See United States v. Johnson*, 2024 WL 4612888, at \*13 (E.D. Mich. Oct. 29,

2024).  Privately held machineguns therefore constitute only a miniscule fraction—

far less than a tenth of a percent—of the nearly half-a-billion guns in the United

States.  And, due to their concentrated ownership, they are possessed by an even

smaller fraction of Americans, rendering them "'highly unusual in society at

large.'"  *Bruen*, 597 U.S. at 47.

      In addition to being uncommon, those few privately owned machineguns are

not used for self-defense—the only purportedly lawful use Taylor identifies. *See*

Def. Br. 9–12, 15–16.[1]  Machineguns are so uncommon, and their use for self-

defense rarer still, that statistics are understandably hard to come by.  Nevertheless,

their conspicuous *absence* from studies of defensive gun uses—even studies by

opponents of firearm regulation—confirms their lack of use for self-defense.  One

study, for instance, found that that 79.7% of defensive gun uses involved a

handgun, 13.9% a shotgun, and 6.4% a rifle, without even including a category for

machineguns.  Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The*

*Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology

150, 185 (1995).  Another study produced (roughly) similar results—65.9% of

incidents involved handguns, 21.0% shotguns, and 13.1% rifles—again, without

even mentioning machineguns.  William English, *2021 National Firearms Survey:*

*Updated Analysis Including Types of Firearms Owned* 14 (May 13, 2022),

https://perma.cc/9L8W-Y3HT.  Data drawn from "The Heritage Foundation's

database, which is meant to 'highlight' stories of successful self-defense," likewise

revealed that only "2%" of incidents "involve[ed] any kind of rifle, with no further

breakdown," let alone a category for machineguns.  *Nat'l Ass'n for Gun Rts. v.*

---

[1] Taylor does not contend that "mere possession" of a machinegun as a collectors' item constitutes a lawful *use*.  *Bianchi*, 111 F.4th at 460.  Using a firearm, after all, requires "'active employment' of the weapon."  *Id.* (quoting *Bailey v. United States*, 516 U.S. 137, 143–45 (1995)).

*Lamont*, 685 F. Supp. 3d 63, 96 (D. Conn. 2023). And yet another study concluded that "when citizens fire shots in self-defense, they fire an average of two shots and, 97% of the time, fire five shots or fewer"—suggesting little defensive need for the torrent of bullets produced by a machinegun. *Bianchi*, 111 F.4th at 459. Because there is "no common-sense reason . . . for a law-abiding citizen to prefer a" machinegun "for a lawful purpose like self-defense, and no evidence suggests that law-abiding citizens nonetheless commonly choose the weapon for lawful uses," this Court "can conclude that" machineguns are "not in common use for lawful purposes." *Price*, 111 F.4th at 405.

Taylor, for his part, offers not a shred of evidence that machineguns are commonly used for self-defense. *See generally* Def. Br. 9–19. Instead, Taylor invokes Seventh Circuit precedent to claim that illegal weapons can be considered in determining whether a weapon is in "'common use'" for lawful purposes. Def. Br. 10–11 (quoting *Friedman*, 784 F.3d at 409). *Friedman*, however, held nothing of the sort. There, the Seventh Circuit upheld a prohibition on assault weapons and large-capacity magazines despite "uncertainty whether the banned weapons are commonly owned." *Friedman*, 784 F.3d at 409. Treading the same path, this Court explained that "[j]ust because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms." *Bianchi*, 111 F.4th at 460. But the reality that the Second Amendment might

permit even some commonly used weapons to be banned (if sufficiently dangerous and militaristic) says nothing about whether *illegal* weapons can be considered in assessing whether a weapon is in common use *for lawful purposes* (a contradiction in terms).

What's more, even if statistics regarding the number of illegal machineguns could be considered, Taylor offers only a report indicating that the ATF recovered 365 illegal machineguns and 1,704 illegal conversion devices from 2017 to 2021. Def. Br. 10 (citing ATF, *National Firearms Commerce and Trafficking Assessment: Firearms Trafficking Investigations - Volume Three, Part X: National Illegal Firearm Recoveries* 4 (2024), https://perma.cc/MJ8Q-EJUQ). More recent statistics suggest that from 2018 to 2023, the ATF seized 31,000 conversion devices. Dept' of Just., *Justice Department Releases New Training to Focus on Detecting Machine Gun Conversion Devices* (Sept. 6, 2024), https://perma.cc/94TU-B6WJ. There is, however, no evidence that those illegal machineguns were used for a lawful purpose such as self-defense. And even recognizing that the ATF may recover only a fraction of illegal devices, those numbers hardly move the needle when compared with the nearly half-a-billion firearms owned by the public.

*The legislative landscape.* The number of "jurisdictions" that "bar" machineguns further supports that they are not in common use for lawful purposes.

*E.g.*, *Hollis*, 827 F.3d at 449; *United States v. Alsenat*, 734 F. Supp. 3d 1295, 1304

(S.D. Fla. 2024).  Thirty-six states (plus D.C.) make it a crime to possess an

unregistered machinegun or prohibit private possession of machineguns entirely.[2]

Four more states prohibit possession for an "offensive or aggressive purpose," with

Connecticut and Maryland presuming such purpose if the machinegun is not

registered.[3]  Finally, Mississippi and Vermont prohibit the possession of

---

[2] *See* Alaska Stat. § 11.61.200(a)(3), (h)(1)(C); Ariz. Rev. Stat. Ann. §§ 13-3101(A)(8)(a)(iii), 13-3102(A)(3); Cal. Penal Code § 32625(a); Colo. Rev. Stat. § 18-12-102(1), (3); D.C. Code §§ 7-2502.02(a)(2), 22-4514(a); Del. Code Ann. tit. 11, § 1444(a)(5); Fla. Stat. § 790.221(1); Ga. Code Ann. § 16-11-122; Haw. Rev. Stat. § 134-8(a); 720 Ill. Comp. Stat. 5/24-1(a)(7)(i); Ind. Code § 35-47-5-8; Iowa Code §§ 724.1(1)(a), 724.3; Kan. Stat. Ann. § 21-6301(a)(5); La. Stat. Ann. § 40:1752(A); Me. Stat. tit. 17-A, § 1051; Mass. Gen. Laws ch. 140, § 131(o), ch. 269, § 10(c); Mich. Comp. Laws § 750.224(1)(a); Minn. Stat. § 609.67; Mo. Rev. Stat. § 571.020(1)(6)(A); Neb. Rev. Stat. § 28-1203(1); Nev. Rev. Stat. § 202.350(1)(b); N.J. Stat. Ann. § 2C:39-5(a); N.Y. Penal Law § 265.02(2); N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11(E), (K)(1), 2923.17(A); Or. Rev. Stat. § 166.272; 18 Pa. Cons. Stat. § 908; R.I. Gen. Laws § 11-47-8(a); S.C. Code Ann. § 16-23-230; S.D. Codified Laws §§ 22-1-2(8), (23), 22-14-6; Tenn. Code Ann. § 39-17-1302(a)(3); Tex. Penal Code Ann. § 46.05(a)(1)(B); Va. Code Ann. § 18.2-295; Wash. Rev. Code § 9.41.190(1)(a); W. Va. Code § 61-7-9; Wis. Stat. § 941.26(1g)(a).  The statutes include varying exceptions (or affirmative defenses) for, among others, law enforcement or military use, Colo. Rev. Stat. § 18-12-102(5), possession by money carriers or bank employees, D.C. Code § 22-4514(a), inoperable weapons or antiques, Fla. Stat. § 790.221(1), scientific research, Del. Code Ann. tit. 11, § 1444(b)(1), licensed dealers or manufacturers, Ariz. Rev. Stat. Ann. § 13-3102(F), or compliance with federal law, W. Va. Code § 61-7-9.

[3] Ark. Code Ann. § 5-73-204; Conn. Gen. Stat. § 53-202 (presuming "offensive or aggressive purpose" if machinegun is not registered); Md. Code Ann., Crim. Law §§ 4-403, 4-405(a)(1)(iii) (same); Mont. Code Ann. § 45-8-304; *see also* Va. Code Ann. §§ 18.2-290, 18.2-291(3), 18.2-295 (presuming "offensive or

unregistered machinegun conversion devices (but not traditional machineguns).[4]
In total, 42 states and D.C. either categorically prohibit or heavily regulate private
possession of traditional machineguns, conversion devices, or both. And, to state
the obvious, federal law bans machineguns in *every* state. The reality that
machineguns are illegal under federal law and independently prohibited in most
states confirms they are "not in common use." *Hollis*, 827 F.3d at 450–51.

Justice Alito's (non-binding) concurrence in *Caetano v. Massachusetts* does
not dictate a different result. *See* Def. Br. 11 (citing 577 U.S. at 420 (Alito, J.,
concurring in judgment)). There, in arguing that "stun guns" are commonly owned
for lawful purposes, Justice Alito noted that they are (i) "nonlethal," (ii) legal in
"45 states," and (iii) "'[h]undreds of thousands'" are owned by "'private citizens.'"
*Caetano*, 577 U.S. at 420–22; *see also Avitabile v. Beach*, 368 F. Supp. 3d 404,
408–13 (N.D.N.Y. 2019) (similar). Machineguns, by contrast, are exceptionally
lethal, *illegal* under federal law and in most states, and fewer than 176,000 are
owned by the public. *See supra* at 13–20. Indeed, Justice Alito himself appears to
recognize that machineguns are not protected by the Second Amendment: Only

---

aggressive purpose" if machinegun is not registered *and* directly prohibiting
possession of unregistered machinegun).

[4] Miss. Code Ann. § 97-37-39; Vt. Stat. Ann. tit. 13, § 4022 (prohibiting bump
stocks). Additionally, twenty-five states and D.C. prohibit conversion devices and
traditional machineguns. *See infra* at 31 n.5.

last term, he emphasized their "lethal effect" and urged Congress to "remedy" the "disparate treatment" of "machineguns" and "bump stocks"—devices enabling semi-automatic rifles to approach a machinegun's rate of fire. *Garland v. Cargill*, 602 U.S. 406, 429 (2024) (Alito, J., concurring).

All told, common sense, statistics, and the legislative landscape confirm what this Court and the Supreme Court have long recognized—"machineguns are not in common use for a lawful purpose." *Price*, 111 F.4th at 403 (citing *Heller*, 554 U.S. at 625, 629).

> **2. Section 922(o) is consistent with the historical traditions of prohibiting "dangerous and unusual" weapons and those that are "excessively dangerous."**

Even were machineguns bearable arms within the meaning of the Second Amendment, Congress's ban on machinegun possession "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. In assessing a statute's consistency with historical tradition, the Second Amendment does not require a "law trapped in amber." *Rahimi*, 602 U.S. 691. Rather, "the challenged regulation" need only be "'relevantly similar'" and "consistent with the principles that underpin our regulatory tradition." *Id.* at 692. Judged by that standard, Section 922(o) fits neatly within two historical traditions of firearm regulation—banning weapons that are dangerous and unusual and those that are excessively dangerous.

In *Heller*, the Supreme Court recognized "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" 554 U.S. at 627. That tradition, the Court explained, "supported" prohibiting weapons not "'in common use at the time'" and the "ban[]" on machineguns such as "M–16 rifles." *Id.* Since *Heller*, the Supreme Court has time and again reaffirmed the "'dangerous and unusual'" tradition. *Caetano*, 577 U.S. at 412 (per curiam); *Bruen*, 597 U.S. at 21, 47; *Rahimi*, 602 U.S. at 691.

In addition to the tradition of prohibiting dangerous and unusual weapons recognized by the Supreme Court, this Court has recognized a tradition of banning "excessively dangerous weapons." *Bianchi*, 111 F.4th at 446. Other circuits have trod the same ground. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 237 (D.C. Cir. 2024) (per curiam) ("particularly dangerous weapons"); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 48 (1st Cir. 2024) (weapons that "are more dangerous, and no more useful for self-defense"); *Bevis*, 85 F.4th at 1199 ("especially dangerous weapons").

Both the "dangerous and unusual" and "excessively dangerous" traditions support the constitutionality of Section 922(o). Machineguns are unusual and excessively dangerous for the same reasons they are not in common use. *See supra* part A.1. First, the Supreme Court has already determined as much, as the precedent of this Court and its sister circuits confirms. Second, common sense

dictates that their extraordinary lethality and diminished accuracy make them poor fits for self-defense. Third, fewer than 176,000 are owned by the public, rendering them highly unusual as compared with the nearly half-a-billion privately owned firearms. Fourth, their possession by ordinary Americans is constrained by federal law and in virtually every state. And, to reiterate, Taylor does not even attempt to claim that machineguns are not dangerous and barely contests that they are unusual. *Cf.* Def. Br. 15–16 (suggesting that conversion devices are *less* dangerous).

Taylor disputes the similarity of laws prohibiting "'going armed, with dangerous or unusual weapons, to terrify the good people of the land.'" Def. Br. 17 (quoting *Rahimi*, 602 U.S. at 697). Those "going-armed" laws, he claims, limit the tradition of prohibiting "dangerous and unusual weapons" only to bearing dangerous weapons in a "threatening or terrifying manner," but not "the mere possession" of such weapons. *Id.* at 17–19. That contention is wrong, as text, precedent, and history show.

The text of the Second Amendment, for one, draws no distinction between "'keep[ing]'" and "'bear[ing]' arms." *Md. Shall Issue, Inc.*, 116 F.4th at 223. Nor does precedent recognizing the tradition of regulating "dangerous and unusual" weapons. In *Rahimi*, the Supreme Court rejected Taylor's distinction, making clear that "[s]ome jurisdictions *banned* the carrying of 'dangerous and unusual

23

weapons.'" 602 U.S. at 691 (emphasis added). Similarly, in *Bruen*, the Supreme Court noted that "colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons.'" 597 U.S. at 47. *Heller*, in turn, explained that "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" "fairly support[s]" "ban[s]" on the "M–16" machinegun. 554 U.S. at 627. This Court, too, confirmed that "'dangerous and unusual'" weapons "could be banned without infringing upon the right to bear arms." *Bianchi*, 111 F.4th at 450. The same holds true for "excessively dangerous weapons." *Id.* at 452.

Text and precedent aside, there are numerous historical examples of "outright bans" on possessing dangerous and unusual (and excessively dangerous) weapons. *See Bianchi*, 111 F.4th at 466–68 (reviewing historical prohibitions on "weapons such as Bowie knives, dirks, sword canes, metal knuckles, slungshots, and sand clubs" (footnotes omitted)); *e.g.*, Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90 (prohibiting possession or sale of Bowie knives, pistols, dirks, sword canes, or spears). Indeed, even the dissenting opinion in *Bianchi*, which contested the historical tradition prohibiting "exceptionally dangerous weapons," acknowledged the tradition empowering "the government to *ban* dangerous and unusual weapons." *Bianchi*, 111 F.4th at 508–16 (Richardson, J., dissenting) (emphasis added) (surveying historical statutes prohibiting the "possession, sale, or exchange of weapons like pistols, Bowie knives, or slung-shots" and historical

cases upholding such laws against constitutional challenge). Text, history, and precedent thus all support banning dangerous and unusual weapons.

Taylor also posits that Arkansas and Virginia prohibitions on possessing machineguns for an "offensive or aggressive purpose" are "more comparable modern analogues" to historical going-armed laws. Def. Br. 18. Perhaps so, but the Second Amendment is not "a regulatory straightjacket," *Bruen*, 597 U.S. at 30, and "a challenged regulation" need not "precisely match its historical precursors," *Rahimi*, 602 U.S. at 692. Rather, a law need only "'be analogous enough to pass constitutional muster'"—not a "'dead ringer' or a 'historical twin.'" *Id.* Just so here. Moreover, Taylor ignores the other historical sources just discussed—such as outright bans—supporting the prohibition of "dangerous and unusual" and "exceptionally dangerous" weapons.

At points, Taylor appears to suggest that this Court is limited to considering only the exact historical sources the government identified in its response to Taylor's motion to dismiss before the district court. *See* Def. Br. 17. Not so. For one, this Court may affirm the denial of a motion to dismiss an indictment "'on any grounds apparent from the record.'" *United States v. Brehm*, 691 F.3d 547, 552 (4th Cir. 2012); *see also Sloas v. CSX Transp., Inc.*, 616 F.3d 380, 388 n.5 (4th Cir. 2010) ("An appellee may defend, and this Court may affirm, the district court's judgment on any basis supported by the record."). For another, "'variations' on

arguments made below may be pursued, so long as the . . . party 'asked both courts to evaluate the same fundamental question.'" *United States v. Boyd*, 5 F.4th 550, 556 (4th Cir. 2021); *see also Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("parties are not limited to the precise arguments they made below").  And once this Court or the Supreme Court hold that a tradition of firearm regulation is "fairly supported" by history, *Heller*, 554 U.S. at 627, the government need not, for obvious reasons, lard up every brief and response with a rote recitation of every statute and historical source supporting that tradition.

Taylor's attempt to narrowly recast the historical tradition of firearm regulation, rather than contest the rarity and dangerousness of machineguns, only confirms they are "dangerous and unusual" and "exceptionally dangerous" weapons the Second Amendment permits the government to regulate.

### B.      At a minimum, Section 922(o) is constitutional as applied to Taylor's possession of a machinegun conversion device.

Taylor's possession of a machinegun conversion device, at the very least, is unprotected by the Second Amendment because conversion devices are not "arms" at all—rather, they are mere firearm accessories.  And conversion devices are even less common, less used for lawful purposes, and more dangerous than machineguns generally.  Because Taylor does not otherwise identify particular facts of this case that would render Section 922(o) unconstitutional as applied to him, the Court should affirm.

26

### 1. Conversion devices are unprotected firearm accessories, not protected "arms."

Conversion devices are firearm accessories, rather than "arms" protected by the Second Amendment. The Second Amendment shields only bearable "'arms'" and perhaps, by implication, "accoutrements" "necessary" to an "arm's function," such as "cleaning materials" or "bullets." *Saleem*, 2024 WL 5084523, at *2; *e.g.*, *United States v. Peterson*, --- F.4th ----, 2025 WL 414654, at *2–3 (5th Cir. 2025). By contrast, mere accessories that are not "necessary" for a weapon to "be useful and functional" are not protected. *Saleem*, 2024 WL 5084523, at *2. In *Heller*, the Supreme Court defined "'arms' as 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* (quoting 554 U.S. at 581). "That is, to constitute an 'arm,' the object in question must be a weapon." *Peterson*, 2025 WL 414654, at *2.

Applying that standard, this and every other circuit to address "silencers" have held that they are unprotected accessories. *Saleem*, 2024 WL 5084523, at *2; *Peterson*, 2025 WL 414654, at *2–3; *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Courts have reached the same conclusion regarding all manner of other devices including "stabilizing brace[s]," *Miller v. Garland*, 674 F. Supp. 3d 296, 314 (E.D. Va. 2023), "laser sights," *Arms v. City of Chicago*, 2024 WL 3495010, at *7–10 (N.D. Ill. July 22, 2024), and machinegun conversion devices, *Johnson*, 2024 WL 4612888, at *12; *Alsenat*, 734 F. Supp. 3d at 1308–09.

The Second Amendment's text amply supports that conclusion: Conversion devices are neither armor nor "'bearable arm[s]' . . . capable of casting a bullet." *Saleem*, 2024 WL 5084523, at *2. "Without being attached to a firearm," a conversion device "would not be of much use for self-defense." *Peterson*, 2025 WL 414654, at *3. "And unless a" conversion device "itself is thrown (which, of course, is not how firearms work), it cannot do any casting or striking." *Id.* Likewise, while a conversion device greatly "enhances" a firearm's "rate of fire" (and dangerousness), *Johnson*, 2024 WL 4612888, at *12, "that usefulness does not transform a" conversion device "into a bullet caster," *Peterson*, 2025 WL 414654, at *3. At bottom, because a "firearm will still be useful and functional without" one, conversion devices do "not fall within the scope of the Second Amendment's protection." *Saleem*, 2024 WL 5084523, at *2.

The reality that the conversion device found in Taylor's waistband was attached to a gun does not alter that conclusion. JA84. "The Government does not lose its ability to regulate" a conversion device "merely because it is affixed to a firearm." *Price*, 111 F.4th at 408.

Nor are conversion devices transmuted into protected arms by virtue of Congress labeling them "machinegun[s]." 26 U.S.C. § 5845(b). After all, Congress could just as easily have prohibited conversion devices without that definitional convenience by, for instance, directly prohibiting "machine gun

conversion device[s]," Miss. Code Ann. § 97-37-39(1)(a), "auto sear[s]," Va. Code Ann. § 18.2-308.5:1(A), or "rate of fire enhancement[s]," Conn. Gen. Stat. § 53-206g(a). For good reason, such legislative labels "cannot change" an object's status "for *constitutional* purposes," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 544 (2012), nor "define the substance of constitutional guarantees," *Nev. Dep't of Hum. Res. v. Hibbs*, 538 U.S. 721, 728 (2003). Confirming as much, this Court held that silencers are not protected arms despite Congress's decision to label them "firearm[s]." 26 U.S.C. § 5845(a)(7); *see Saleem*, 2024 WL 5084523, at *2. "Congress's inclusion of [conversion devices] in the definition of 'machinegun'" thus does not "control whether [a conversion device] is an 'Arm' under the Second Amendment." *Alsenat*, 734 F. Supp. 3d at 1307; *see also United States v. Berger*, 715 F. Supp. 3d 676, 702 n.20 (E.D. Pa. 2024) ("[C]ourts should not simply follow the legislature's label of something (or someone) for Second Amendment purposes.").

### 2. Conversion devices are rarer, more dangerous, and less useful for lawful purposes than traditional machineguns.

In any event, conversion devices are even more clearly "dangerous and unusual," "excessively dangerous," and not in "common use for lawful purposes" than are machineguns generally.

Machineguns, to reiterate, are "best suited for war," *Price*, 111 F.4th at 406, and "used principally by persons engaged in unlawful activities," *Haynes*, 390 U.S.

at 87, due to their "'murderously effective firepower,'" *Henry*, 688 F.3d at 640. Given that "immense danger," "choosing the weapon" is an act of "moral depravity," *O'Brien*, 560 U.S. at 230, and machineguns have "'no appropriate sporting use or use for personal protection,'" *Hollis*, 827 F.3d at 448.

Pistols equipped with conversion devices, if anything, are even more "attractive to violent criminals" because they are "[m]uch easier to conceal than" traditional machineguns and "can be hidden under a coat, tucked into a bag, or stowed under a car seat. And like a handgun, they can be fired with one hand— except to more lethal effect." *Johnson v. United States*, 576 U.S. 591, 640 (2015) (Alito, J., dissenting) (discussing short-barreled shotguns). Conversion devices "thus combine the deadly characteristics of conventional" machineguns "with the more convenient handling of handguns." *Id.* Bald assertions that conversion devices are used for self-defense aside, Taylor offers "no common-sense reasons . . . for a law-abiding citizen to" use one. *Price*, 111 F.4th at 405.

To the contrary, Taylor's own statistics show that conversion devices are unusual and used almost exclusively by criminals. He notes that from 2017 to 2021, 55% of ATF illegal firearm recoveries (or 1,704 total) were conversion devices. Def. Br. 10 (citing ATF, *National Firearms Commerce and Trafficking Assessment: Firearms Trafficking Investigations - Volume Three, Part X: National Illegal Firearm Recoveries* 4 (2024), https://perma.cc/MJ8Q-EJUQ). More recent

statistics indicate that the ATF seized 31,000 conversion devices over the last five years. Dept' of Just., *Justice Department Releases New Training to Focus on Detecting Machine Gun Conversion Devices* (Sept. 6, 2024), https://perma.cc/94TU-B6WJ. Either way, the reality that conversion devices make up a significant portion of ATF seizures only shows that, like "short-barreled shotguns," they are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Likewise, the small number of seizures— when compared with the half-a-billion privately owned firearms—confirms that conversion devices "'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47.

To the extent Taylor suggests conversion devices are in common use (or not unusual) because seizures are increasing, that confuses "becoming more common" with "being 'in common use.'" *See Fisher*, 2024 WL 589115, at *2.

Finally, the number of "jurisdictions" that prohibit conversion devices confirms they are uncommon and unusual. *Hollis*, 827 F.3d at 449–51. Forty-two states and D.C., to repeat, ban or heavily regulate machineguns. *Supra* at 19–20. Of those, at least 27 and D.C.—including every state in this Circuit—specifically prohibit conversion devices (as, obviously, does federal law).[5] The remainder

---

[5] Cal. Penal Code §§ 16880(b), 32625(a); Colo. Rev. Stat. §§ 18-12-101(1)(g)(2), 18-12-102(1), (3); Conn. Gen. Stat. § 53-206g(a), (c); D.C. Code §§ 7-2501.01(10), 7-2502.02(a)(2), 22-4514(a); Del. Code Ann. tit. 11,

prohibit weapons converted into machineguns with conversion devices but have not yet updated their statutes to prohibit conversion devices themselves. *E.g.*, Tex. Penal Code Ann. §§ 46.01(9), 46.05(a)(1)(B) (prohibiting weapons "capable of shooting more than two shots automatically, without manual reloading, by a single function of the trigger").

Common sense and lethality, statistics, and state law thus all support that conversion devices are not in common use by the public for lawful purposes and are "dangerous and unusual" and "exceptionally dangerous"—taking them outside the Second Amendment's protection.

### 3. Taylor's remaining arguments miss the mark.

In the face of the dozens of post-*Bruen* district court opinions upholding Section 922(o), *e.g.*, *United States v. Chan*, 2024 WL 4028019, at *6 n.16 (D.

---

§ 1444(a)(6); Fla. Stat. § 790.222; Haw. Rev. Stat. §§ 134-1, 134-8(a), 134-8.5; 720 Ill. Comp. Stat. 5/24-1(a)(7)(i); Ind. Code §§ 35-31.5-2-190(b)(2), 35-47-5-8; Iowa Code §§ 724.1(1)(a), (e), 724.3; La. Stat. Ann. §§ 40:1751, 40:1752(A); Md. Code Ann., Crim. Law §§ 4-301(m)–(o), 4-305.1(a)(2); Mass. Gen. Laws ch. 140, § 121, ch. 269, § 10(c); Mich. Comp. Laws § 750.224e(1)(a); Minn. Stat. § 609.67, subd. 1(d)–(e), 2(a); Miss. Code Ann. § 97-37-39; Nev. Rev. Stat. § 202.274(1)(a)–(b); N.J. Stat. Ann. § 2C:39-3(l); N.Y. Penal Law §§ 265.00(26)–(30), 265.01-c; N.C. Gen. Stat. § 14-409; Ohio Rev. Code Ann. §§ 2923.11(E), (K)(1), (6), 2923.17(A); R.I. Gen. Laws § 11-47-8(d); S.C. Code Ann. §§ 16-23-210(a), 16-23-230; Vt. Stat. Ann. tit. 13, § 4022 (prohibiting only bump stocks); Va. Code Ann. § 18.2-308.5:1; Wash. Rev. Code § 9.41.190(1)(b); W. Va. Code § 61-7-9 (prohibiting machineguns unless "fully compli[ant]" with federal law, without defining machineguns); Wis. Stat. § 941.25(1)(b), 941.26(1g)(a).

Haw. Sept. 3, 2024) (collecting cases), Taylor identifies a single contrary decision, *United States v. Morgan*, 2024 WL 3936767 (D. Kan. Aug. 26, 2024)—which the government has appealed, No. 24-3141 (10th Cir.). *Morgan* erred many times over. For one, it concluded that conversion devices are "'arms'" based on the government's failure to argue that they are "a mere accessory" and the reality that they are "integral" to converting a handgun into a machinegun. *Morgan*, 2024 WL 3936767, at *2 & n.1. But, to reiterate, a device must be "necessary" to render a weapon "functional" to be protected by the Second Amendment. *Saleem*, 2024 WL 5084523, at *2; *see supra* part B.1. The "usefulness" of a conversion device in enhancing a firearm's rate of fire no more renders it a protected arm than does a silencer's utility in reducing the noise produced by a firearm. *Peterson*, 2025 WL 414654, at *3.

Next, *Morgan* dismissed as "dicta" *Heller*'s confirmation that machineguns are dangerous and unusual and not commonly used for lawful purposes and thus may be banned. 2024 WL 3936767, at *2. This Court, however, has reiterated and relied on *Heller*'s assurance in upholding prohibitions on assault weapons, *Bianchi*, 111 F.4th at 454–59, and firearms with obliterated serial numbers, *Price*, 111 F.4th at 403–06, meaning it is "not dicta," *Lennear*, 937 F.3d at 273. *See supra* at 11–12. In any event, this Court is "not free to ignore the Supreme Court's substantive dictum," which it owes "'substantial, if not controlling deference.'"

33

*Md. Shall Issue, Inc.*, 116 F.4th at 221–22.

In a similar vein, *Morgan* purported to restrict the historical tradition of prohibiting dangerous and unusual weapons to carrying them "in a manner to terrorize the public." 2024 WL 3936767, at *3–4. As explained, this Court and the Supreme Court have surveyed the historical record (which includes "outright bans" on such weapons) and have made clear that the tradition extends to bans on mere possession. *E.g.*, *Bianchi*, 111 F.4th at 466–68; *see supra* at 23–25.

*Morgan* likewise erred by looking to the 741,000 registered machineguns, rather than the fewer than 176,000 in civilian hands, 2024 WL 3936767, at *4— although either number falls well short of "common use" when compared with the hundreds of millions of privately owned firearms. *See supra* at 14–15. And, contrary to Taylor's suggestion that *Morgan* affirmed the "prevalence" of conversion devices, Def. Br. 12, it did not engage with their rarity at all, *see* 2024 WL 3936767, at *4.

Finally, *Morgan* placed too much weight on the reality that it is "perfectly legal" to possess a registered, pre-1986 machinegun. 2024 WL 3936767, at *4. For one, Taylor points to no such "perfectly legal" pre-1986 conversion devices. For another, the reality that some few collectors lawfully own machineguns does not mean they are not uncommon and unusual. Otherwise, any exception to a ban would paradoxically render a weapon common and usual, and the prohibition

unconstitutional (unless the weapon was "excessively dangerous").

A second recent district court opinion upholding a Section 922(o) challenge is even less helpful to Taylor. *See United States v. Brown*, 2025 WL 429985 (S.D. Miss. Jan. 29, 2025). There, the government failed to present any "factual argument about commonality" and the district court consequently refused to "go looking for facts that have not been presented before it." *Id.* at *4–5. Moreover, the district court incorrectly determined that the Fifth Circuit's holding that "[m]achineguns are dangerous and unusual and therefore not in common use," *Hollis*, 827 F.3d at 451, had been abrogated by *Bruen* and a subsequent Fifth Circuit decision, *Diaz*, 116 F.4th at 465. *Brown*, 2025 WL 429985, at *5. *Bruen* and *Diaz*, however, abrogated only the portion of *Hollis* describing the second, "'means-end scrutiny' step" of the pre-*Bruen* Second Amendment inquiry. *Diaz*, 116 F.4th at 463–65 (citing *Hollis*, 827 F.3d at 446). *Bruen*, to reiterate, reaffirmed the "'common use'" and "'dangerous and unusual'" limitations on the Second Amendment right. 597 U.S. at 21, 32, 47. *Bruen* and *Diaz* thus "provide no basis . . . to depart from" the Fifth Circuit's "previous" holding that machineguns are dangerous and unusual and not in common use. *Hunt*, 123 F.4th at 704. Indeed, the Fifth Circuit itself confirmed as much in a post-*Bruen* case, recognizing that the defendant's challenge to Section "922(o)" remains "foreclosed by *Hollis v. Lynch*." *Ovalle*, 2024 WL 4678881, at *1.

Taylor also claims that handguns equipped with conversion devices are less dangerous than traditional machineguns or the assault weapons at issue in *Bianchi*. Def. Br. 14–16. His argument, however, focuses mostly on the—uncontested— benefits of handguns, the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. But Taylor offers little support for his assertion that conversion devices "do[] not significantly alter" a handgun's "functionality or dangerousness." Def. Br. 14–16.

Taylor suggests that a "typical user" can quickly and accurately fire multiple rounds from a Glock-style handgun without a conversion device. Def. Br. 15 (citing J. Patrick Coolican, *18 Rounds in 5 Seconds: How Glock Became 'America's gun'*, Las Vegas Sun (Jan. 17, 2012), https://perma.cc/539X-UA94). True or not—the article cited by Taylor notes "how difficult it is to hit a target, even at close range" and describes the shooting prowess of a firearms historian, not a "typical user"—that only demonstrates the danger of conversion devices. Taylor does not contest that a conversion device both greatly increases a handgun's rate of fire and decreases its accuracy by making it "more difficult to control, and therefore more dangerous." *Fisher*, 2024 WL 589115, at *2. Taylor offers "no common-sense reasons" why "a law-abiding citizen" interested in "self-defense" (as opposed to crime) would trade the speed and accuracy of a handgun for the *less* accurate spray of bullets produced by a weapon equipped with a conversion

device—let alone "evidence" that Americans actually do so. *Price*, 111 F.4th at 405.

Taylor also claims that the military does not use "fully automatic sidearms." Def. Br. 15. But, again, that is likely because an automatic handgun is "more difficult to control" than even a "typical machinegun." *Fisher*, 2024 WL 589115, at *2. Unlike the criminals who use conversion devices, the military has little need to trade the "comparative lack of recoil" and "accuracy" of the M16 machinegun, *Bianchi*, 111 F.4th at 455–56, for the "'concealability'" of a handgun equipped with a conversion device, *Cox*, 906 F.3d at 1185. The reality that automatic handguns are *not* useful for military purposes thus does nothing to establish that conversion devices are useful (let alone commonly used) for self-defense.

### C. Taylor's facial challenge is underdeveloped and meritless.

Taylor's facial constitutional challenge to Section 922(o) says too little and falters on its own terms. *See* Def. Br. 19.

Taylor abandoned the claim as an initial matter. His brief devotes only three sentences to the facial challenge, contending that Section 922(o) is facially unconstitutional "[f]or many of the same reasons explained above." Def. Br. 19. Taylor's "'passing shot at the issue'" with no effort at "any substantive argument" "waived" the facial challenge. *E.g.*, *United States v. Taylor-Sanders*, 88 F.4th 516, 525 n.5 (4th Cir. 2023).

In addition, Taylor's facial challenge falls apart on the merits. To prevail on a facial challenge, Taylor must "'establish that no set of circumstances exists under which the Act would be valid.'" *Rahimi*, 602 U.S. at 693. Section 922(o), as explained, is constitutional in all its applications because the Second Amendment does not protect machineguns. *See supra* part A. At the least, the statute's constitutionality as to conversion devices, *see supra* part B, "ends" Taylor's "facial challenge," *United States v. Canada*, 123 F.4th 159, 162 (4th Cir. 2024).

### Conclusion

The Court should affirm the judgment of the district court.

Respectfully submitted,

Erik S. Siebert
United States Attorney

_____/s/_____

James Reed Sawyers
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 8,900 words) as counted by Microsoft Word.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

_____/s/_____
James Reed Sawyers
Assistant United States Attorney