No. 24-4392

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

GERALD KEMONDRE TAYLOR,
*Defendant/Appellant.*
————————

On Appeal From the United States District Court
for the Eastern District of Virginia
Richmond Division (The Hon. Roderick C. Young)
————————

REPLY BRIEF OF THE APPELLANT
————————

GEREMY C. KAMENS
Federal Public Defender

Salvatore M. Mancina
Laura J. Koenig
Assistant Federal Public Defenders
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Sam_Mancina@fd.org
Laura_Koenig@fd.org

# **TABLE OF CONTENTS**

Table of Authorities ................................................................................. ii

Argument.............................................................................................1

I.   Section 922(o) is Facially Unconstitutional. ...................................2

     A.   Mr. Taylor's facial challenge has not been waived. ............................2

     B.   Machineguns are protected by the Second Amendment because
          they are commonly used for lawful purposes. ......................................3

          1.   *Heller* and this Court's case law do not resolve this case...........4

          2.   Statistics and common sense show that machineguns are
               in common use for lawful purposes. ..........................................9

     C.   The government has failed to meet its burden to show that
          Section 922(o) is consistent with this nation's tradition of firearm
          regulation. ..........................................................................15

II.  Section 922(o) is Unconstitutional As Applied to Mr. Taylor. .....................17

     A.   A handgun affixed with a conversion device is protected by the
          Second Amendment. ..........................................................17

     B.   Handguns with conversion devices are commonly used and not
          dangerous and unusual. ....................................................18

Conclusion .........................................................................................20

Certificate of Compliance

# TABLE OF AUTHORITIES

## Cases

*Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) ....................................10

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ....................................13

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) .............................................. *passim*

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................................ 9, 10

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... *passim*

*Duncan v. Bonta*, ___ F.4th ___, 2025 WL 867583 (9th Cir. 2025)......................18

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015)........................13

*Hamblen v. United States*, 591 F.3d 471 (6th Cir. 2009) .........................................8

*Lennear v. Wilson*, 937 F.3d 257 (4th Cir. 2019) ....................................................8

*N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022)................. *passim*

*United States v. Brown*, ___ F. Supp. 3d ___, 2025 WL 429985 (S.D. Miss. 2025)
...................................................................................................................... 12, 16

*United States v. Carter*, 669 F.3d 411 (4th Cir. 2012) .............................................7

*United States v. Fincher*, 548 F.3d 868 (8th Cir. 2008) ...........................................8

*United States v. Johnson*, 2024 WL 4612888 (E.D. Mich. Oct. 29, 2024) .............10

*United States v. Miller*, 307 U.S. 174 (1939) ..........................................................5

*United States v. Morgan*, 2024 WL 3936767 (D. Kan. Aug. 26, 2024)..... 14, 16, 18

*United States v. Price*, 111 F.4th 392 (4th Cir. 2024) .........................................3, 8

*United States v. Rahimi*, 602 U.S. 680 (2023)................................................. 15, 16

*United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51 (E.D.N.Y. 2023) ..................................................................................................................5

*United States v. Taylor-Sanders*, 88 F.4th 516 (4th Cir. 2023) ...........................2, 3

## Statutes

18 U.S.C. § 922(o) .......................................................................................... *passim*

26 U.S.C. § 5845 ....................................................................................................17

Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, § 102 (9), 100 Stat. 451, 453 (1986) ...................................................................................................5

National Firearms Act of 1934, Pub. L. No. 73-474, § 3(a), 48 Stat. 1236, 1237 (1934) ................................................................................................................5

## Other Authorities

ATF, *Firearms Commerce in the United States 2011* (2011), https://www.atf.gov/file/56646/download ............................................................9

ATF, *Firearms Commerce in the United States: Annual Statistical Update 2021* (2021), https://www.atf.gov/resource-center/docs/report/2021-firearms-commerce-report/download ...................................................................................9

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150 (1995)....... 12, 13

Giffords Law Center, *Machine Guns & 50 Caliber Weapons* (last accessed March 20, 2025), https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/machine-guns-50-caliber/#footnote_84_5658 ...............................14

Roque Planas, *It's Easier Than You'd Think to Buy a Machine Gun*, HuffPost (May 19, 2024), https://www.huffpost.com/entry/easy-to-buy-machine-gun_n_66428edde4b09724138d3f35..............................................................................11

Scott Glover, *ATF on the Hunt for Thousands of Illegal Machine Gun Conversion Devices Smuggled into US*, CNN (May 23, 2019), https://www.cnn.com/2019/05/23/us/atf-agents-hunting-down-illegal-machine-gun-device-invs .......20

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://perma.cc/9L8W-Y3HT .......13

No. 24-4392

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

GERALD KEMONDRE TAYLOR,
*Defendant/Appellant*.

_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Richmond Division (The Hon. Roderick C. Young)

_____

REPLY BRIEF OF THE APPELLANT

_____

## ARGUMENT

Gerald Taylor argues that his conviction pursuant to 18 U.S.C. § 922(o) violates the Second Amendment under the two-part test articulated in *N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1 (2022). The government argues in response that § 922(o)'s constitutionality has already been decided by the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008)—a case about a handgun ban in the District of Columbia. But *Heller*, as may be apparent,

never directly addressed the constitutionality of § 922(o) or machinegun possession. *Heller*'s oblique references to machineguns is dicta and insufficient to settle the matter conclusively.

Without the benefit of *Heller*'s dicta, the government cannot show that § 922(o) is constitutional under *Bruen*'s two-part test. At step one, the government argues that machineguns are not protected by the plain text of the Second Amendment because they are not in common use for lawful purposes. But it ignores two essential facts: (1) that there are nearly 750,000 legally registered machineguns in the United States today, and (2) that machineguns have been around for well over a century and have never been fully banned under federal law. Those two facts are sufficient to show that machineguns are in common use for lawful purposes. At step two, the government has failed to meet its burden to provide historical regulations that are relevantly similar to § 922(o). For these reasons, this Court should conclude that § 922(o) is unconstitutional and vacate Mr. Taylor's conviction.

I.      SECTION 922(O) IS FACIALLY UNCONSTITUTIONAL.

    A.      Mr. Taylor's facial challenge has not been waived.

The government argues that Mr. Taylor waived his facial challenge because he only took a "passing shot at the issue" in his opening brief. Gov't 37 (quoting *United States v. Taylor-Sanders*, 88 F.4th 516, 525 n.5 (4th Cir. 2023)). This is wrong. Unlike the defendant in *Taylor-Sanders*, who did not make "any substantive

argument," 88 F.4th at 525 n.5, Mr. Taylor's opening is littered with substantive arguments that go to his facial challenge. *E.g.*, Opening Br. 11 (explaining that "machineguns generally are in common use in the United States"); *id*. at 17 ("The government has failed to provide a relevantly similar historical analogue to show that § 922(o) is deeply rooted in this Nation's historical tradition of firearm regulation."). Many of these arguments were made in the as-applied section of the opening brief, so instead of repeating them, Mr. Taylor merely incorporated them by reference into this facial-challenge section. Opening Br. 19 ("For many of the same reasons explained above, § 922(o) is facially unconstitutional."). As a result, Mr. Taylor has not waived his facial challenge.

B.   <u>Machineguns are protected by the Second Amendment because they are commonly used for lawful purposes.</u>

The parties agree that the key question at step one of the *Bruen* analysis is whether machineguns are in common use for a lawful purpose. Gov't Br. 8; *United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) (en banc) (explaining that at *Bruen* step one courts ask whether the weapons being regulated were "in common use for a lawful purpose") (internal quotation marks and citation omitted). The government believes the answer to that question is resolved by two snippets of dicta in *Heller*— a case about the constitutionality of D.C. law banning *handgun* possession in the home. But a careful reading of *Heller* shows that its two fleeting references to machineguns do not answer the question posed in this case. Moreover, courts cannot

forgo a *Bruen* analysis by simply adopting *Heller*'s musings on the constitutionality of firearm regulations not at issue in that case. Putting precedent aside, statistics and common-sense show that machineguns are in common use for lawful purposes. The government's attempts to spin the data in their favor are unpersuasive.

1. *Heller* and this Court's case law do not resolve this case.

Reading the government's brief, one would be forgiven for believing that *Heller* explicitly concluded that machineguns are not in common use and may be banned. Gov't Br. 4, 9, 22, 24. The government cherry-picks quotes from *Heller*, melding language from various pages or paragraphs together to create a sentence that matches its preferred argument. *See* Gov't Br. 24 ("*Heller*, in turn, explained that 'the historical tradition of prohibiting the carrying of "dangerous and unusual weapons"' 'fairly support[s]' 'ban[s]' on the 'M-16' machinegun"). But *Heller* said no such thing. The 63-page *Heller* majority opinion mentions machineguns twice, both times to address minor counterarguments. A close inspection of these references to machineguns will show that *Heller* did not conclusively and forevermore resolve the issue of whether machineguns are commonly used *today* for lawful purposes.

First, the *Heller* majority stated that it would be "startling" if the Second Amendment rendered "the National Firearms Act's restrictions on machineguns … unconstitutional." 554 U.S. at 624. But this dictum is inapposite because § 922(o)

4

is not part of the National Firearms Act. "The NFA, when passed in 1934, did not criminalize the manufacture or possession of machineguns, but instead subjected machineguns to a $200 per-unit tax." *United States v. Rare Breed Triggers, LLC*, 690 F. Supp. 3d 51, 75 (E.D.N.Y. 2023) (citing National Firearms Act of 1934, Pub. L. No. 73-474, § 3(a), 48 Stat. 1236, 1237 (1934)). Section 922(o) was enacted in 1986 as an amendment to the Gun Control Act, and it prohibited the possession and transfer of any machinegun not lawfully possessed before 1986 (the year the law took effect). *See* Firearms Owners' Protection Act of 1986, Pub. L. No. 99-308, § 102 (9), 100 Stat. 451, 453 (1986). The mere suggestion in *Heller* that the NFA's taxation and regulation of machineguns is constitutional says nothing about the constitutionality of a broader possession ban like § 922(o).

Moreover, as explained in the opening brief, *Heller* only mentioned the NFA to rebut an argument that *United States v. Miller*, 307 U.S. 174 (1939), should be read to mean that the Second Amendment only protects weapons that are useful in warfare. Opening Br. 12-13. *Heller* clarified that *Miller* really stood for the proposition that the Second Amendment only protected arms that were "typically possessed by law-abiding citizens for lawful purposes." 554 U.S. at 625. The Court explained that *Miller* only mentioned the usefulness of weapons in warfare because at the time of the time of the founding, "weapons used by militiamen and weapons used in defense of person and home were one and the same." *Id*. (citation omitted).

By the time the NFA was passed in 1934, however, military technology had advanced so much that many guns used in warfare (like machineguns) were not commonly used by citizens for lawful purposes. *Id*. at 624.

Thus, *Heller*'s discussion of *Miller*, at most, implies that machineguns were primarily used in warfare in the 1930s. *Id*. (noting that "machineguns" were "useful in warfare in 1939"). But the same is not true today. There are nearly 750,000 lawfully registered firearms in the United States, owned and possessed by law-abiding citizens. Opening Br. 11. And even though Congress heavily regulates and limits the possession of machineguns, it has never completely banned civilian possession of machinegun ownership. *See* § 922(o)(2)(B) (allowing civilians to possess machineguns "lawfully possessed" before 1986).

Second, *Heller* mentions machineguns again while addressing a hypothetical counterargument: "if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right [would be] completely detached from the prefatory clause." 554 U.S. at 627. The implication is that M-16 rifles may be banned. But the Court's hypothetical is not a binding pronouncement about the constitutionality of M-16 rifles, let alone all firearms that can be categorized as a machinegun.

In any event, *Heller* is clear that courts should not follow dicta in cases about the scope of the Second Amendment, where the amendment "was not at issue and

was not argued." *See* 554 U.S. at 625 n.25. The same logic should extend to *Heller*'s own speculation about the legality of machinegun bans. The *Heller* Court was not presented with detailed arguments about the constitutionality of machinegun bans. The Court's speculation about machinegun usage or the legality of machinegun bans, without the aid of adversarial testing, does not alleviate this Court of its responsibility to independently assess the constitutionality of § 922(o).

*Bruen* confirms that *Heller*'s dicta should not be taken for more than it is worth. *Bruen* also confronted a type of firearm regulation—a law restricting the concealed carry of firearms in public—that *Heller* categorized as "presumptively lawful." *Heller*, 554 U.S. at 626 (noting that "the majority of 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues"); *United States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("*Heller* lists several examples of what the Court deemed to be 'presumptively lawful regulatory measures,' including prohibitions on carrying concealed weapons …..") (citation omitted).

If *Heller*'s description of concealed-carry bans were dispositive, the Court would simply have deferred to *Heller* and upheld New York's statute on that basis. But the Court instead undertook an exhaustive historical survey of the law governing concealed carrying, from medieval England up to late-19th-century America. *Bruen*, 597 U.S. at 33-70. And after reviewing that history, the Court reached a

conclusion different from its offhand remark in *Heller*, holding that laws burdening concealed carry are *un*constitutional, at least where the state also forbids open carry. *See id.* at 52-55, 59. *Bruen* is clear: Rather than treating *Heller*'s dicta as dispositive, courts must rigorously scrutinize every firearm regulation to determine if it (1) regulates conduct covered by "the Second Amendment's plain text" and (2) is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

These issues with *Heller*'s dicta also doom the government's reliance on this court's decisions in *Price* and *Bianchi v. Brown*, which have cited *Heller* to boldly declare that "machineguns are not in common use for a lawful purpose." *Price*, 111 F.4th at 403; *Bianchi v. Brown*, 111 F.4th 438, 445 (4th Cir. 2024) (en banc) (concluding that *Heller* found it was not in "serious dispute" that weapons like M-16 rifles may be banned).[1] But the statements in *Price* and *Bianchi* about machineguns are not binding on this Court. As an initial matter, neither case addresses the constitutionality of § 922(o) or machinegun possession generally, so their statements on machineguns were not "integral to the analytical foundations" their holdings, and are therefore dicta. Gov't Br. 11-12 (quoting *Lennear v. Wilson*, 937 F.3d 257, 273 (4th Cir. 2019)).

---

[1] The pre-*Bruen*, out-of-circuit cases the government cites similarly rest their entire analysis on the dicta in *Heller*. *See, e.g.*, *Hamblen v. United States*, 591 F.3d 471, 473-74 (6th Cir. 2009); *United States v. Fincher*, 548 F.3d 868, 873-74 (8th Cir. 2008).

More importantly, as noted, *Bruen* makes it clear that this Court cannot blindly adopt stray language in other cases about the validity of firearm regulations not at issue in those cases. This Court has an obligation to determine whether the specific firearms being regulated by the statute at issue in this case are in common use today for lawful purposes. This Court's language in *Price* and *Bianchi* is not a substitute for that analysis.

In sum, *Heller* does not resolve this case, and this Court must independently assess whether machineguns are in common use for lawful purposes. The evidence discussed below, shows that they are.

2.    <u>Statistics and common sense show that machineguns are in common use for lawful purposes.</u>

The evidence shows that machineguns are commonly used for lawful purposes today. As noted in the opening brief, the most recent data indicates that there were 741,146 registered machineguns in 2021[2]—a significant increase over the 456,920 machineguns registered a decade earlier.[3] Opening Br. 11. That is far more than the roughly 200,000 stun guns Justice Alito found sufficient to show "common use" in *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J.,

---

[2] ATF, *Firearms Commerce in the United States: Annual Statistical Update 2021* 15-16 (2021), https://www.atf.gov/resource-center/docs/report/2021-firearms-commerce-report/download.

[3] ATF, *Firearms Commerce in the United States 2011* 24 (2011), https://www.atf.gov/file/56646/download.

concurring in judgment); *see also Avitabile v. Beach*, 368 F. Supp. 3d 404, 411–12 (N.D.N.Y. 2019) (finding evidence that at least 300,000 tasers were owned by private citizens in the United States sufficient to show the weapon was "in common use"). Given these numbers, it is easy to see that machineguns, "[w]hile less popular than handguns, … are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano*, 577 U.S. at 420 (Alito, J., concurring in judgment).

The government responds with several arguments, none of which are persuasive. *First*, it argues that we should only consider the number of machineguns civilians can lawfully own: that is, machineguns manufactured and lawfully possessed before 1986. Gov't Br. 15, 34. According to the government, there are only 175,977 pre-1986 machineguns that can be lawfully possessed by civilians. Gov't Br. 15 (citing J.A. 18). The rest, the government claims, are possessed by law enforcement agencies and dealers who provide guns to law enforcement. Gov't Br. 15.[4] Even if that were correct, the government fails to adequately explain why courts should ignore the hundreds of thousands of weapons owned by law enforcement and dealers. If every police department in the country is stocked with machineguns, that

_____

[4] The government also claims that "'many' civilian-owned machineguns 'are collector items' held by a limited number of collectors." Gov't Br. 15 (quoting *United States v. Johnson*, 2024 WL 4612888, at *13 (E.D. Mich. Oct. 29, 2024)). But neither the government, nor the case it cites, offer any support for this claim. It is pure speculation.

might suggest that machineguns are not "highly unusual in society at large" and are suitable for self-defense. *Heller*, 552 U.S. at 627. After all, police departments are charged with protecting the public, not waging war.

The government's exclusion of machineguns possessed by licensed dealers is particularly troublesome because many gun enthusiasts know that they can shoot machineguns recreationally if they are federally licensed firearms dealers. *See* Roque Planas, *It's Easier Than You'd Think to Buy a Machine Gun*, HuffPost (May 19, 2024), https://www.huffpost.com/entry/easy-to-buy-machine-gun_n_66428 edde4b09724138d3f35. In other words, dealers—who are part of "society at large"—often use machineguns to lawfully engage in recreational shooting.

Lastly, even if this Court only considered the government's lower figure— roughly 176,000 machineguns—that would still be sufficient to show "common use." Justice Alito's concurrence in *Caetano* did not set 200,000 as the constitutional floor. The fact that tens of thousands, if not hundreds of thousands, of law-abiding citizens possess machineguns is enough to show that these weapons are common.

*Second*, the government argues that machineguns are not commonly used for self-defense because they are extremely lethal and inflict damage beyond what is needed in most self-defense situations. Gov't Br. 13-14. No doubt, machineguns are lethal and dangerous. And they should be used with extreme care and caution.

But the government ignores the fact that individuals use firearms, including machineguns, for multiple purposes aside from self-defense: recreational target shooting, hunting, and competitive shooting. *Cf. Bianchi*, 111 F.4th at 518-19 (Richardson, J., dissenting) (noting that AR-style rifles are used for many lawful purposes such as target shooting and hunting). In fact, the government has conceded in another case that "machineguns are sometimes used for lawful purposes (i.e., shooting at a target)." *United States v. Brown*, ___ F. Supp. 3d ___, 2025 WL 429985, at *2 (S.D. Miss. 2025).

And even though there may not be many documented self-defense cases where a machinegun was actually fired, that does not mean machineguns are not used for self-defense. A machinegun may not often be discharged for self-defense purposes, but it can function "both as a backup plan and even as a deterrent." *Bianchi*, 111 F.4th at 518 n.60 (Richardson, J., dissenting). Indeed, the mere presence of a machinegun will likely be sufficient to dissuade a would-be assailant or burglar.

The government, however, claims that machineguns are never used for self-defense, citing two firearms surveys that catalogued the types of weapons used in self-defense cases. Gov't Br. 16. The studies lump firearms into broad categories—handguns, shotguns, and rifles. *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. &

Criminology 150, 185 (1995); William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 14 (May 13, 2022), https://perma.cc/9L8W-Y3HT.[5]  The government simply assumes the absence of a machinegun category means no machineguns have ever been used for self-defense.  But that is pure speculation.  Neither study distinguished between manual rifles and semi-automatic rifles; they simply categorized both types as "rifles."  Thus, the more likely scenario is that the studies accounted for machineguns by counting them within a broader category—*e.g.*, a fully automatic rifle was classified as a rifle.

Putting the specifics of the studies aside, the government's statistical arguments rest upon circular logic.  The reason machineguns are not used in most self-defense cases is because there is a broad federal ban on machineguns—§ 922(o).  *Bevis v. City of Naperville*, 85 F.4th 1175, 1195 (7th Cir. 2023) (noting that the reason "civilians do not regard machineguns as useful for self-defense … is because they cannot purchase machineguns").  Under the government's logic, every law that imposes a categorical ban on a particular type of firearm will have to be upheld as constitutional because the type of firearm being regulated is unlikely—because of the categorical ban—to be commonly owned.  That cannot be right.  "A law's

---

[5] The Kleck and Gertz study does distinguish between revolvers and semi-automatic handguns.  Kleck & Gertz, *supra* at 185.

existence can't be the source of its own constitutional validity." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015).

*Third and finally*, the government points to the number of state laws prohibiting and regulating machinegun possession. But the reality is that "35 states only regulate machine guns that are possessed in violation of federal law or do not impose any state-level regulations." *See* Giffords Law Center, *Machine Guns & 50 Caliber Weapons* (last accessed March 20, 2025), https://giffords.org/lawcenter /gun-laws/policy-areas/hardware-ammunition/machine-guns-50-caliber/#footnote_ 84_5658. The government acknowledges that many states only make it a crime to possess "an unregistered machinegun." Gov't Br. 19.

In addition, the government's discussion of machinegun laws overlooks a vital fact: civilian machinegun possession has always been permitted under federal law. True, § 922(o) severely limits machinegun possession, but it does not ban it. A civilian can possess a machinegun "so long as it was lawfully possessed by someone before the relevant date in 1986, and so long as he complies with the National Firearms Act's requirements to obtain and possess the weapon." *United States v. Morgan*, 2024 WL 3936767, at *4 (D. Kan. Aug. 26, 2024). By authorizing civilian possession, Congress clearly believes people can use machineguns for lawful purposes.

C.    The government has failed to meet its burden to show that Section 922(o) is consistent with this nation's tradition of firearm regulation.

Because machineguns are protected by the plain text of the Second Amendment, the government "bears the burden to justify" § 922(o) by showing that it is consistent with this Nation's history of firearm regulation.  *United States v. Rahimi*, 602 U.S. 680, 691 (2023) (quotations and citation omitted).  The government argues that there is a historical tradition of banning dangerous and unusual weapons and excessively dangerous weapons.  Gov't Br. 22.  But instead of justifying § 922(o) by pointing to relevantly similar founding-era laws, the government relies—yet again—on *Heller*.

While *Heller* states that there is a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" the Court was clear that it did "not undertake an exhaustive historical analysis … of the full scope of the Second Amendment."  554 U.S. at 626-27.  As noted above, the government cannot use *Heller* as an excuse to shirk its responsibility to justify its own firearm regulations.  And courts are not "obliged to sift the historical materials for evidence to sustain" firearm regulations.  *Bruen*, 597 U.S. at 60.

The government eventually points to some historical laws, including an 1837 Georgia statute that banned the possession of unusual weapons, like Bowie knives and metal knuckles.  Gov't Br. 24; *see also Bianchi*, 111 F.4th at 466-67 (cataloguing

laws on dangerous weapons from the mid-19th century). But laws passed nearly 50 years after ratification, shed little light on the "public understanding of the [Second Amendment] right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37.

The government argues that there were some colonial- and founding-era laws that banned the possession of dangerous and unusual weapons. Gov't Br. 23-24 (quoting *Rahimi*, 602 U.S. at 691). But *Rahimi* makes clear that the going-armed laws that banned the possession of dangerous and unusual weapons, required a "judicial determination" that "a particular defendant … had threatened another with a weapon." *Rahimi*, 602 U.S. at 699. Section 922(o) does not require such a finding; instead, it categorically bans the possession of any machinegun not lawfully possessed before 1986.

Even if there is a historical tradition of banning dangerous and unusual weapons, machineguns do not fall into that category. *See Morgan*, 2024 WL 3936767, at *4 (concluding that the government has not shown that machineguns are dangerous and unusual); *Brown*, 2025 WL 429985, at *3-5 (same). Machineguns are not unusual because, as noted above, they are commonly owned, as there are nearly three-quarters of a million registered machineguns in circulation. And while machineguns are dangerous, they are not so dangerous that the federal government has completely forbidden civilians from possessing them. For as long as

machineguns have been around, the federal government has allowed civilian to possess them.

II.   SECTION 922(O) IS UNCONSTITUTIONAL AS APPLIED TO MR. TAYLOR.

A.   A handgun affixed with a conversion device is protected by the Second Amendment.

Before reaching the "common use" issue, one threshold question is whether a handgun with an affixed conversion device is a weapon that is protected by the Second Amendment at all.   The Supreme Court held that the term "arms" in the Second Amendment includes all "bearable arms," including any weapon that "a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  *Heller*, 554 U.S. at 581-82 (citation omitted).   A handgun with an affixed conversion device surely meets this definition because it is a bearable arm—a weapon that one can use for self-defense.

The government argues that the conversion device is not protected by the Second Amendment because it is simply an accessary, like a firearm suppressor or silencer, that is not necessary to a firearm's functionality.  Govt' Br. 27-29.  But, in this case, the conversion device was affixed to a handgun, transforming it into a machinegun.  *See* 26 U.S.C. § 5845(b) (defining a machinegun as "any weapon which shoots … automatically more than one shot, without manual reloading, by a single function of the trigger").  The conversion device was an integral and necessary

component of the "arm[]" being regulated in this case—the fully automatic handgun Mr. Taylor possessed.  *See Morgan*, 2024 WL 3936767, at *2 n.1 (explaining that a "switch is … an integral component of what makes the Glock to which is attached a machinegun").

Indeed, courts have made clear that Second Amendment's text carries "an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm." *Duncan v. Bonta*, ___ F.4th ___, 2025 WL 867583, at *8 (9th Cir. 2025).  While a conversion device is not necessary to make a handgun function, it is necessary for the handgun to operate like a machinegun—the type of firearm Mr. Taylor was convicted of possessing.  Breaking the machinegun Mr. Taylor possessed down into its component parts, as the government urges, makes scant sense.  All machineguns—including machinegun rifles, like the M-16—have components that enable automatic fire.  But if Mr. Taylor had been caught with an M-16, the government would not argue that we should only consider whether the automatic-firing component is protected by the Second Amendment. The same is true here.  This Court should not treat the automatic handgun Mr. Taylor was found with any differently than other machineguns.

B.   <u>Handguns with conversion devices are commonly used and not dangerous and unusual.</u>

The government does not dispute that handguns are the prototypical self-defense weapon.  *See* Gov't Br. 36; *Bianchi*, 111 F.4th at 451 (describing handguns

as "the quintessential self-defense weapon" (quoting *Heller*, 554 U.S. at 629)). Instead, the government argues that handguns affixed with a conversion device, which renders them fully automatic, are not commonly used for a lawful purpose and are dangerous and unusual. Govt Br. at 30-32. But the government ignores two key facts about conversion devices that show why they are commonly used and not particularly dangerous or unusual.

First, handguns affixed with conversion devices are more suitable for self-defense because they are far less damaging than automatic, or even semi-automatic, rifles. Opening Br. 14. Handguns have less stopping power and inflict less damage than rifles, like the AR-15. *Bianchi*, 111 F.4th at 458 (comparing AR-15s with typical handguns). To be sure, automatic weapons are less accurate, as the government notes, but they are not vastly different from semi-automatic handguns, which allows users to fire 18 rounds in 5 second and can be hard to control. Opening Br. 15. And as conversion devices become more popular, including among criminals, law-abiding citizens will want guns with similar capabilities for self-defense.

Second, conversion devices are increasingly popular and widely available. As the government notes, the ATF has seized 31,000 conversion devices over the last five years, Gov't Br. 18, but that number likely pales in comparison to the true number of conversion devices possessed by civilians. Conversion devices are

remarkably cheap, as low as $20, and can be purchased online from dealers in China and Russia.  Scott Glover, *ATF on the Hunt for Thousands of Illegal Machine Gun Conversion Devices Smuggled into US*, CNN (May 23, 2019), https://www.cnn.com/2019/05/23/us/atf-agents-hunting-down-illegal-machine-gun-device-invs.  The ATF discovered that one Chinese exporter had over 3,800 Paypal transactions with U.S. customers.  *Id*.

In sum, conversion devices are widely available and common in the United States.  They are also used for lawful purposes because they are frequently affixed to handguns, the quintessential self-defense weapon.  For these reasons, § 922(o) is unconstitutional as applied to Mr. Taylor.

## CONCLUSION

For all these reasons, Mr. Taylor's conviction under 18 U.S.C. § 922(o) violates the Second Amendment.  This Court should reverse, vacate, and remand the case to the district court with instructions to dismiss the indictment.

Respectfully submitted,

GEREMY C. KAMENS
Federal Public Defender
for the Eastern District of Virginia

   s/  Salvatore M. Mancina
_____
Salvatore M. Mancina
Laura J. Koenig
Assistant Federal Public Defenders
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Sam_Mancina@fd.org
Laura_Koenig@fd.org

Date: March 21, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This reply brief has been prepared using Microsoft Word for Office 365, Times New Roman font, 14-point proportional type size.

2. Excluding the table of contents, table of authorities, signature block, and this certificate of compliance, this brief contains no more than 6,500 words, specifically 4,446 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

  March 21, 2025       s/ Salvatore M. Mancina
     Date          Salvatore M. Mancina
                 Assistant Federal Public Defender